THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA TURNPIKE                    :
COMMISSION,                              :
                                         :
              Plaintiff,                 :        3:25-CV-910
       v.                                :        (JUDGE MARIANI)
                                         :
1101 NORTHERN BLVD, LLC                  :
                                         :
              Defendant.                 :

## MEMORANDUM OPINION

Before the Court is a motion dismiss filed by defendant 1101 Northern Blvd, LLC

("Defendant").  (Doc. 19).  For the reasons that follow, the motion will be denied.

### I.    PROCEDURAL HISTORY

On May 22, 2025, plaintiff Pennsylvania Turnpike Commission ("Plaintiff" or the

"Commission") filed a complaint against Defendant.  (Doc. 1).  After Defendant moved to

dismiss, the Commission filed the First Amended Complaint ("FAC").  On December 23,

2025, Defendant filed the instant motion to dismiss.  (Doc. 19).  The Commission opposes

the motion, (Doc. 23), and Defendant did not submit a reply brief responding to the

Commission's arguments.  The motion has been fully briefed and ripe for disposition.

### II.   FACTUAL ALLEGATIONS

The FAC alleges the following:

The Commission "is an instrumentality of the Commonwealth of Pennsylvania that

operates the Pennsylvania Turnpike System."  (Doc. 11, ¶ 8).  The Commission owns land

in South Abington Township on which the Clarks Summit Bridge is located (the "Property").[1] (*Id.*, ¶ 9). Defendant is a Wyoming Limited Liability Company with its principal place of business in New Jersey. (*Id.*, ¶ 10). Defendant is, or was, "engaged in the development of a new Sheetz gasoline station and convenience store located at 1101 Northern Boulevard, South Abington Township, Pennsylvania." (*Id.*, ¶ 11). The Sheetz development is adjacent to the Commission's Property. (*Id.*).

The Commission "is the owner in fee of the Property, which is part of the limited access right-of-way for the Pennsylvania Turnpike Northeastern Extension (I-476) and is located under and adjacent to the Clarks Summit Bridge." (*Id.*, ¶ 12). The Clarks Summit Bridge, which was completed in 1957, "stands more than one hundred fifty feet above the land below," and "spans more than sixteen hundred feet and carries four lanes of interstate traffic." (*Id.*, ¶ 13). The Property underneath the bridge includes, limited vegetation bridge support pillars, and open land leading to Fall Creek. (*Id.*, ¶ 14). "The Property is used for the purpose of protecting the Clark Summit Bridge right-of-way and its support pillars and for ensuring the structural integrity of the Clarks Summit Bridge." (*Id.*, ¶ 15).

In 2019, Defendant and its member Ankim Shah and his affiliated companies, Falcon Companies and Falcon Partners, LLC, set out to develop the Sheetz Development, known

---

[1]    "The Commission is authorized and empowered by Section 3 of the Act of July 18, 2007, P.L. 169, No. 44, as amended, to acquire by purchase or condemnation any lands, rights, easements, franchises and other property deemed necessary or convenient for the construction or efficient operation of the Turnpike." (Doc. 11, ¶ 9).

as "The Shoppes at South Abington," and to include a new Sheetz gasoline station and convenience store. (*Id.*, ¶ 16). The Sheetz Development property is "immediately adjacent" to the Commission's Property and adjacent to and beneath the Clarks Summit Bridge. (*Id.*, ¶ 17).

On or about January 13, 2020, Defendant "applied to the Lackawanna County Conversation District ("LCCD") for coverage under the Pennsylvania Department of Environmental Protection general (PAG-02) National Pollutant Discharge Elimination System ("NPDES") permit to allow for stormwater discharges associated with Defendant's Sheetz Development." (*Id.*, ¶ 18). Section D, Item 5 of the application provides that if an applicant proposes any off-site discharges to areas other than surface water, the applicant "must have appropriate easement that provides the legal authority for this off-site discharge" and further requires the applicant "to provide a demonstration in both the [erosion and sediment control plan ("E&S plan")] and [post-construction stormwater management plan ("PCSM plan")] that discharge will not cause erosion, damage, or nuisance to off-site properties." (*Id.*, ¶ 19). Defendant checked the "Yes" box in the application, indicating that the Sheetz Development proposed an off-site discharge, and therefore must comply with the conditions of Section D, Item 5. (*Id.*, ¶ 20). "Defendant neither requested nor obtained an easement from the Commission that would allow for the alteration of the existing conveyance channel and stormwater outfall and continued discharge onto the Commission's Property." (*Id.*, ¶ 21).

Without the consent or permission from the Commission, Defendant entered the Commission's Property, dug out the existing stormwater conveyance channel, removed the existing outfall pipe, and added a larger outfall pipe (the "altered stormwater infrastructure") on the Commission Property that is now discharging stormwater flows onto and across the Property, toward Fall Creek. (*Id.*, ¶ 22). "Defendant altered the stormwater infrastructure without obtaining an easement on the Property for the expansion of the channel and enlargement of the stormwater outfall or for the resulting stormwater discharge therefrom." (*Id.*, ¶ 23). Defendant's E&S plan and PCSM plan "failed to provide a demonstration that the discharge would not cause erosion, damage, or nuisance to the Commission's Property." (*Id.*, ¶ 24).

On March 27, 2020, the LCCD approved Defendant's request for coverage and issued Defendant a PAG-02 NPDES General Permit for Discharges of Stormwater Associated with Construction Activities. (*Id.*, ¶ 25). Defendant submitted an application for renewal of the NPDES Permit in 2024, and a renewed permit was issued on or about December 11, 2024. (*Id.*, ¶ 26). Defendant's "NPDES Permit and its renewal incorporated the application, the E&S plan and the PCSM plan." (*Id.*, ¶ 27). Part B.III.F of Defendant's NPDES Permit specifies that "approval of coverage under [the NPDES Permit] does not authorize any injury to persons or property or invasion of other private rights. . . ." (*Id.*, ¶ 28). Part C.XII.E of Defendant's NPDES Permit also requires Defendant to "ensure that [erosion and sediment control best management practices (E&S BMPs")] and [post-

4

construction stormwater management stormwater control measures ("PCSM SCMs")] are installed and maintained for all off-site discharges to areas other than surface waters, as applicable, including but not limited to swales, ditches, and the ground surface." (*Id.*, ¶ 29).

Pursuant to the plans submitted along with the NPDES application, Defendant constructed new stormwater infrastructure designed to convey the stormwater from the Sheetz Development to Fall Creek. (*Id.*, ¶ 30). Without the Commission's permission or an appropriate easement allowing for construction, Defendant altered the stormwater infrastructure on the Property beneath the Clarks Summit Bridge. (*Id.*, ¶ 31). Upon information and belief, Defendant failed to ensure that E&S BMPs and PCSM SCMs were installed and maintained for the stormwater discharges onto the Property. (*Id.*, ¶ 32).

Defendant's altered stormwater infrastructure associated with the Sheetz Development and the continuous unpermitted discharge of stormwater therefrom has caused, and is continuing to cause, "significant damage to the Commission's Property, including but not limited to: significant erosion of the land surface; the creation of gullies and channels through the vegetated area of the Property that never existed before; potential for substantial and continued flooding of the Property; the creation of ponded water in area that never before existed on the Property; the expansion of ponded water on the Property; and carrying of trash, debris, sediment, and other pollution onto the Property." (*Id.*, ¶ 34). The altered stormwater infrastructure and continuous discharge of stormwater is occurring "in the absence of demonstrations to determine whether increases or changes n discharges

to the Property will cause erosion, damage, or a nuisance to the Property, including the Clarks Summit Bridge's structural pillars, as required under Defendant's NPDES Permit, Section D, Item 5." (*Id.*, ¶ 35). Because of the altered stormwater infrastructure and resulting stormwater discharge on the Property, "the Property is significantly and substantially damaged." (*Id.*, ¶ 36). This damage "will continue unless and until the Defendant fully restores the stormwater infrastructure on the Property" to "the condition it was in prior to the Defendant's illegal and unauthorized modification of the stormwater infrastructure on the Property and allowing the discharge of stormwater to continue to occur." (*Id.*).

On September 27, 2024, the Commission notified Defendant of the damage to its Property caused by Defendant's construction, including notifying Defendant that "[a] stormwater inlet, outlet pipe and new drainage ditch has been constructed on Commission property—*without permission or notice to the Commission*." (*Id.*, ¶ 37) (emphasis in original). The Commission further directed Defendant to immediately cease and desist from the trespass on Commission's Property. (*Id.*). On February 7, 2025, the Commission, through counsel, again notified the Defendant of the unauthorized construction and trespass. (*Id.*, ¶ 38). The Commission also requested additional documents and information related to the Sheetz Development and requested a plan for the immediate removal of the stormwater infrastructure from the Commission's Property. (*Id.*).

On March 21, 2025, the Commission, through counsel, again contacted Defendant about the unauthorized construction and trespass. (*Id.*, ¶ 39). The Commission also provided formal notice of its intent to sue Defendant to the Pennsylvania Department of Environmental Protection, as required by Section 601(e) of the Pennsylvania Clear Streams Law, 35 P.S. § 601(e). (*Id.*). Defendant confirmed receipt of the letter that same day. (*Id.*, ¶ 40). On May 15, 2025, Defendant responded to the notice letter, "denying that Defendant constructed the stormwater infrastructure on the Property without permission and denying that Defendant unlawfully altered or diverted flow of water or stormwater onto the Property." (*Id.*, ¶ 40).

In Count I, the Commission brings a claim for negligence. (*Id.*, ¶¶ 42-54). As alleged in the FAC, Defendant "owes a duty of care to the Commission to act reasonably in the exercise of Defendant's business and its construction of the Sheetz Development, including construction of the altered stormwater infrastructure." (*Id.*, ¶ 43). Defendant "failed to notify Plaintiff that it was undertaking construction work on the Commission's Property and altering the stormwater infrastructure on the Property, failed to seek the Commission's consent to enter the Property and alter the stormwater infrastructure on the Property, and failed to seek the Commission's consent to allow the resulting stormwater discharge therefrom." (*Id.*, ¶ 44). Defendant "was negligent in the construction and alteration of the stormwater infrastructure on the Property." (*Id.*, ¶ 45). More specifically, Defendant "knew, or in the exercise of reasonable due care should have known, that the

7

alteration of the stormwater infrastructure on the Property, and the resulting stormwater discharge therefrom, would result in harm and damage to the Property." (*Id.*, ¶ 46).

Defendant "breached the standard of care, acted unreasonably, and was negligent in constructing and altering the stormwater infrastructure on the Property without the Commission's permission, by not seeking the Commission's consent before doing so, and by illegally trespassing on the Property." (*Id.*, ¶ 47).  Moreover, Defendant breached the standard of care and was negligent "by not immediately addressing, responding to, or otherwise taking actions to abate the damage that has been caused, and is continuing to be caused, by the presence and discharges from the altered stormwater infrastructure on the Property." (*Id.*, ¶ 48).  "Defendant's acts or omissions described herein were the direct and proximate cause of the damages and injuries to the Property." (*Id.*, ¶ 49).  To date, and despite being on notice, Defendant "has failed to take any actions to protect against such dangerous conditions or to otherwise ameliorate the damage that is continuing to be caused to the Property each day that the condition remains unbated." (*Id.*, ¶ 50).

Defendant's "acts or omissions were intentional and grossly, recklessly, and wantonly negligent, or were done with utter disregard for the consequence to Plaintiff and the Property, and therefore entitle Plaintiff to an award of punitive damages." (*Id.*, ¶ 51). The Commission "has not contributed to the damages and injuries that have caused to the Property" and "Defendant is liable for all damages and injuries Plaintiff has suffered due to Defendant's negligence." (*Id.*, ¶¶ 52-53).  Defendant "is further liable to remove the altered

stormwater infrastructure from the Commission Property and/or abate, repair, or restore the ongoing damages caused by the unauthorized construction and altered stormwater infrastructure and continuing discharges therefrom." (*Id.*, ¶ 54). The Commission seeks, among other things, compensatory damages, punitive damages, litigation fees and costs, and an injunction enjoining Defendant from its trespass on its Property and directing Defendant "to immediately remove the stormwater infrastructure from the Property." (Doc. 11 at 14-15).

In Count II of the FAC, the Commission brings a claim for private nuisance. (*Id.*, ¶¶ 55-59). Defendant "has unreasonably interfered with the Commission's use and enjoyment of the Property in the form of the illegal construction and alteration of stormwater infrastructure on the Property and the resulting discharge of stormwater onto the Property, which has the potential to impact the bridge pillars of the Clarks Summit Bridge located on the Property." (*Id.*, ¶ 56). Plaintiff has suffered, and will continue to suffer, significant and continuous damage to the Property "as a direct and proximate result of the private nuisance that Defendant created by constructing and illegally altering the unauthorized stormwater infrastructure and the resulting stormwater discharge onto the Property." (*Id.*, ¶ 57). To date, Defendant "has failed to take any actions to protect against such dangerous conditions or to otherwise ameliorate the damage that is continuing to be caused to the Property each day that the condition remains unabated." (*Id.*, ¶ 58). "Each day that the altered stormwater infrastructure and resulting stormwater discharge remain on the Property

continues and exacerbates the nuisance that has caused and will continue to cause significant harm and damage to the Property." (*Id.*, ¶ 59). The Commission seeks, among other things, compensatory damages, punitive damages, litigation fees and costs, and an injunction enjoining Defendant from maintaining the nuisance and directing Defendant "to immediately remove the altered stormwater infrastructure from the Property." (Doc. 11 at 15-16).

In Count III of the FAC, the Commission asserts a claim for trespass. (*Id.*, ¶¶ 60-63). Defendant "knowingly and willfully entered the Property to construct and alter the stormwater infrastructure on the Property without the Commission's consent or permission, and without obtaining an easement for either the presence of the original infrastructure or the alterations to the stormwater infrastructure of the resulting stormwater discharge on the Property." (*Id.*, ¶ 61). Defendant knowingly and willfully has "allowed the altered stormwater infrastructure to remain on the Property after being notified that Plaintiff did not grant any consent or permission to Defendant for same." (*Id.*, ¶ 62). "Each day that the altered stormwater infrastructure remains on the Property constitutes a trespass under law, which has caused, and will continue to cause, significant harm and damage to the Property." (*Id.*, ¶ 63). The Commission seeks, among other things, compensatory damages, punitive damages, litigation fees and costs, and an injunction enjoining Defendant from trespassing on the Commission's Property and directing Defendant "to immediately remove the altered stormwater infrastructure from the Property." (Doc. 11 at 18).

In Count IV, the Commission brings a claim under Pennsylvania's Clean Streams Law, 35 P.S. § 691.1, *et seq* (the "CSL"). (*Id.*, ¶¶ 64-76). 35 P.S. § 691.601(c) provides that "any person having an interest which is or may be adversely affected may commence a civil action or his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act . . . against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." (*Id.*, ¶ 65). The CSL further provides that "[n]o action pursuant to this section may be commenced prior to sixty days after the plaintiff has given notice in writing of the violation to the department and to any alleged violator." (*Id.*, ¶ 66) (citing 35 P.S. § 691.601(e)). Defendant NPDES Permit was issued by the LCCD and remains effective in its renewed form until December 7, 2029. (*Id.*, ¶ 67). Defendant's permit application, E&S plan, and PCSM plan are incorporated into Defendant's NPDES Permit. (*Id.*, ¶ 68). Section D, Item 5 of the application provided that if an applicant proposes any off-site discharges to areas other than surface water, the applicant "must have appropriate easement that provides the legal authority for this off-site discharge" and requires the applicant "to provide a demonstration in both the E&S plan and PCSM plan that the discharge will not cause erosion, damage, or nuisance to off-site properties." (*Id.*, ¶ 69). In its application, Defendant confirmed that the Sheetz Development proposed such an off-site discharge. (*Id.*, ¶ 70).

Part C.XII.E of Defendant's NPDES Permit further requires Defendant to "ensure that E&S BMPs and PCSM SCMs are installed and maintained for all off-site discharges to areas other than surface waters, as applicable, including but not limited to swales, ditches, and the ground surface." (*Id.*, ¶ 71). Defendant "knowingly and willfully constructed and altered the stormwater infrastructure on the Property without obtaining an easement for construction or alteration of the stormwater infrastructure or for the resulting stormwater discharge on the Property." (*Id.*, ¶ 72). Defendant's E&S plan and PCSM plan "failed to demonstrate that Defendant's stormwater discharge would not cause erosion, damage, or nuisance to the Property." (*Id.*, ¶ 73). The Commission alleges, upon information and belief, that Defendant has further "failed to ensure that E&S BMPs and PCSM SCMs were installed and maintained for the stormwater discharges to the Commission's Property." (*Id.*, ¶ 74). Defendant "violated the NPDES Permit and therefore violated the federal Clean Water Act and the PA CSL authorizing the NPDES Permit." (*Id.*, ¶ 75). Plaintiff timely provided notice to Defendant on March 21, 2025, "of Defendant's violation of the PA CSL more than sixty (60) days prior to the commencement of this action." (*Id.*, ¶ 76). The Commission seeks, among other things, attorneys' fees and litigation costs and an injunction enjoining Defendant from maintaining the altered stormwater infrastructure and associated discharges on the Property and directing Defendant "to immediately remove the stormwater infrastructure from the Property." (Doc. 11 at 21-22).

## III.    STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (internal citations omitted).

> [T]he federal courts are without power to adjudicate the substantive claims in a lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal authority is, in a particular instance, open to question, it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition of the merits.

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977). "[T]he burden of establishing the [existence of subject-matter jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted).  Since the federal courts' jurisdiction is strictly limited by Constitution and statute, "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Id.*

A motion to dismiss for lack of subject-matter jurisdiction is properly made under Federal Rule of Civil Procedure 12(b)(1).  "A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).

> A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter

13

jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present. Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint. A factual attack, on the other hand, is an argument that there is no subject matter jurisdiction because the facts of the case – and here the District Court may look beyond the pleadings to ascertain the facts – do not support the asserted jurisdiction.

*Id.* at 358.

When a party files a motion attacking jurisdiction prior to filing an answer to the complaint or otherwise presenting competing facts, the motion is "by definition, a facial attack." *Aichele*, 757 F.3d at 358. Where, as here, the Defendant presents a facial attack on the court's subject matter jurisdiction, "we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001).

## B. Federal Rule of Civil Procedure 12(b)(6).

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

14

to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. 679).

15

## IV.    ANALYSIS

Defendant first moves to dismiss this FAC, claiming that the Commission is an arm of the Commonwealth of Pennsylvania and, as such, is a not a citizen of the Commonwealth for purposes of diversity jurisdiction.  (Doc. 20 at 12-15).  Defendant also seeks dismissal of Counts II, III, and IV of the FAC, asserting that the Commission's private nuisance, trespass, and CSL each fail as a matter of law.  (*Id.* at 16-23).  Defendant further seeks dismissal of the Commission's request for punitive damages in Count I alleging negligence. (*Id.* at 15-16).

### A.    The Turnpike Commission is a Citizen of Pennsylvania.

The Court will first address Defendant's facial challenge to the Court's subject matter jurisdiction.  "District Courts 'have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between' 'citizens of different states.'"  *Johnson v. Mazie*, 144 F.4th 146, 152 (3d Cir. 2025) (quoting 28 U.S.C. § 1332(a)(1)).  It is undisputed that Defendant is a citizen of the State of New Jersey.  28 U.S.C. § 1332

According to Defendant, because the Commission is an arm of the Commonwealth of Pennsylvania, it is not a citizen of the Commonwealth for purposes of diversity jurisdiction.  The Court disagrees.  Because the Commission is a citizen of the Commonwealth of Pennsylvania and Defendant is a citizen of New Jersey, Defendant's motion to dismiss for lack of subject matter jurisdiction will be denied.

16

"There is no question that a State is not a 'citizen' for purposes of diversity jurisdiction." *Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973). The Commission "is a citizen of the State for diversity purposes" unless the Commission is "simply the arm or alter ego of the State." *Id.* (collecting cases). The Third Circuit has long held that the Commission is a citizen of the Commonwealth of Pennsylvania for purposes of diversity jurisdiction. *See Gerr v. Emrick*, 283 F.2d 293, 297-98 (3d Cir. 1960) ("The Commission is a 'citizen' of a state for purposes of diversity of citizenship jurisdiction of the federal courts."); *see also Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1142 (3d Cir. 1995) (holding the Commission "is not an arm or alter ego of Pennsylvania").

In the context of state sovereign immunity, the Supreme Court recently clarified its arm-of-the-state test.[2] "Whether an entity is an arm of the State is a question of federal law that can be answered only after considering the provisions of state law that define the agency's character." *Galette v. New Jersey Transit Corp.*, 146 S. Ct. 854, 865 (2026) (internal citation and quotation marks omitted). The principal inquiry is "whether the State structured the entity as a legally separate entity liable for its own judgments." *Id.* at 868. The "clearest evidence that a State has created a legally separate entity is that it created a

---

[2]    There are no Eleventh Amendment state sovereign immunity issues in this litigation. Rather, the dispute centers on whether the Commission is a citizen of the Commonwealth of Pennsylvania under 28 U.S.C. § 1332(a)(1). Further, even if the Commission was an arm of the state, which it is not, no state sovereign immunity issues are raised in this litigation because to the extent the Commission has any Eleventh Amendment immunity for suit in federal court, it has waived such immunity by initiating this litigation. *See Lapides v. Bd. of Regents of Uni. Sys. Of Georgia*, 535 U.S. 613, 619 (2002) (noting that "more than a century ago this Court indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity") (citing *Clark v. Barnard*, 108 U.S. 436, 447 (1883)).

corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt." *Id.* (citations omitted). The corporate form, however, "is not the only structure that signals the State has created a legally separate entity" and other "aspects of state law may indicate legal separateness as well." *Id.* Courts may also "consider the degree of control the State exerts over the entity," but that inquiry is "not especially probative." *Id.*

The Commission was created by the Pennsylvania General Assembly pursuant to Pennsylvania Turnpike Commission Act, 36 P.S. § 652a-q, as amended. The Commission is "authorized and empowered to construct, operate and maintain a turnpike at such location as shall be approved by the Department of Highways" and "to issue turnpike revenue bonds of the Commonwealth, payable solely from tolls, to pay the cost of such construction." *Id.* The Commission "may sue and be sued, plead and be impleaded, contract and be contracted with, and have an official seal." 36 P.S. § 652d. "The commission is hereby constituted an instrumentality of the Commonwealth, and the exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed and held to be an essential governmental function of the Commonwealth." *Id.* The Commission is further authorized and empowered to, among other things, purchase certain rights of way and to acquire property by condemnation. 36 P.S. §§ 652e, f.

18

The bonds issued by the Commission "shall not be deemed to be a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth, but such bonds shall be payable exclusively from the fund herein provided therefor from tolls." 36 P.S. § 652b. "All such bonds shall contain a statement on their face that the Commonwealth is not obligated to pay the same or the interest thereon except from tolls and that the faith and credit of the Commonwealth is not pledged to the payment of the principal or interest of such bonds." *Id.* The issuance of turnpike revenue bonds "shall not, directly or indirectly or contingently, obligate the Commonwealth to levy or to pledge any form of taxation whatever therefor, or the make any appropriate for their payment." *Id.* The Commission performs "essential governmental functions," and, as such, is exempt from taxation. 36 P.S. § 652k.

In support of its motion, Defendant acknowledges that the Commission "can issue bonds and manage its own revenues." (Doc. 20 at 13). According to Defendant, however, "any significant liability could ultimately impact the financial stability of the Commonwealth" and the Commonwealth "has reserved significant control over Plaintiff's finances, including appointment of commissioners, oversight of its tolling authority and legislative authority to reallocate funds for broader state purposes." (*Id.*). Defendant further claims that Pennsylvania law recognizes the Commission as an instrumentality of the Commonwealth and the Commission lacks the level of independence to be treated as a separate citizen. (*Id.* at 13-15).

19

The principal inquiry to determine whether an entity is a arm of a state is "whether the State structured the entity as a legally separate entity liable for its own judgments." *Galette*, 146 S. Ct. at 865. The "clearest evidence that a State has created a legally separate entity is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt." (*Id.*).

The Pennsylvania Turnpike Commission Act is clear evidence that the Commonwealth created a separate legal entity with the powers to sue and be sued, hold property, make contracts, and incur debt. Defendant's assertion that the Commonwealth's has "significant control" of the Commission's finance has already by rejected by the Third Circuit, albeit in a state sovereign immunity context. *Christy*, 54 F.3d at 1145-46 ("The Commission's evidence of state control over its ability to obtain funds simply fails to show a financial interest on the part of Pennsylvania that would be directly and adversely affected by the diminution of the Commission's funds. . ."). Further, the Commission's power to raise revenue and "and consequent ability to pay a judgment against it, supports the view that the commission need not seek assistance from the state to satisfy a judgment against it." *Id.* at 1147. As such, the Court finds that the Commission is not an arm of the Commonwealth. Because the Commission is not an arm of the Commonwealth of Pennsylvania, it is citizen of Pennsylvania for purposes of diversity jurisdiction. Accordingly, Defendant's motion to

20

dismiss for lack of subject matter jurisdiction on the theory the Commission is not a citizen of Pennsylvania will be denied.[3]

### B. The FAC Plausibly Alleges Claims for Nuisance and Trespass

Defendant moves to dismiss Counts II and III of the FAC alleging private nuisance and Count III alleging trespass. (Doc. 20 at 16-19). The Commission opposes the motion.

### Trespass

The Commission advances two theories of trespass liability in the FAC. (Doc. 23 at 19-22). The first theory of trespass is that Defendant, without permission to do so, engaged in a construction project on the Property. The second theory of trespass liability relates to the unpermitted and altered stormwater discharge alleged to cause damage to the property, including "significant erosion of the land surface; the creation of gullies and channels through the vegetated area on the Property that never existed before; the creation of ponded water in area that never before existed on the Property; and carrying of trash, debris, sediment, and other pollution onto the Property." (Doc. 11, ¶ 34).

---

[3] Defendant also notes that the Commission's "autonomy is substantially constrained" by statute. (Doc. 20 at 15). While courts "may consider the degree of control the State exerts over the entity," such analysis is "not especially probative." *Galette*, 146 S. Ct. at 869. Moreover, the mere fact that state law expressly provides that the Commission is "an instrumentality of the Commonwealth," 36 P.S. § 652d, does not affect this Court's analysis because Pennsylvania law treats the Commission as an "independent", not "surrogate," entity. *Christy*, 54 F.3d at 1148 (determining, on balance, that the Commission is not an arm of the Commonwealth for state sovereign immunity purposes).

Defendant seeks dismissal of the Commission's trespass claim alleged in the FAC, claiming it is barred by common enemy doctrine.[4]  More specifically, Defendant asserts that the FAC "is devoid of allegation that Defendant's storm water infrastructure increased the already natural flow of water." (Doc. 20 at 19).  According to the Commission, "Defendant ignores the fact that it came onto Plaintiff's property without permission and engaged in a construction project—a textbook trespass." (Doc. 23 at 20).  Because Defendant move to dismiss only the Commission's second theory of trespass liability, the Court will limit its discussion to this theory.

Pursuant to Section 158 of the Restatement (Second) of Torts, one is subject to liability to another for trespass if he "intentionally enters land in the possession of another or causes a thing or a third person to do so, remains on the land, or fails to remove a thing which one is under a duty to remove." Restatement (Second) of Torts § 158; *see also Briggs v. Southwestern Energy Prod. Co.*, 2024 WL 38298, at *4-10 (M.D. Pa. Jan. 3, 2024) (discussing differences between continuing and permanent trespass); *MD Mall Assoc., LLC*

---

[4]    "In Pennsylvania, specialized rules have been developed as to when an upper landowner may be liable for the effects of surface water running off its property." *Kowalski v. TOA PA V, L.P.*, 206 A.3d 1148, 1160 (Pa. Super. 2019). "The law regards surface water as a common enemy which every proprietor must fight to get rid of as best he may." *Laform v. Bethlehem Twp.*, 499 A.2d 1373, 1378 (Pa. Super. 1985). Pursuant to the common enemy rule, "not only is an owner of higher land under no liability for damage to an owner of lower land caused by water which naturally flows from the one level to the other, but he can, at least in the development of urban property, improve his land by regrading it or erecting buildings thereon, without legal responsibility for any consequent diversion of surface waters from his property to that of adjoining owners, it being recognized that changes or alterations in the surface may be essential to the enjoyment of his property." *Chamberlin v. Ciaffoni*, 373 Pa. 430, 434-35, 96 A.2d 140, 143 (1953)). But there are two exceptions to the common enemy rule, both of which are implicated in this litigation. *See infra* at 23-24.

*v. CSX Transp., Inc.*, 288 F. Supp. 3d 565, 586 (E.D. Pa. 2017) ("Pennsylvania follows the Second Restatement of Torts with respect to claims for trespass and continuing trespass."), *aff'd*, 777 Fed. App'x 43 (3d Cir. 2019).

"Trespass liability is established under Pennsylvania law based on a landowner's control, collection, and shifting of surface water from one location to another via an artificial channel." *MD Mall*, 777 Fed. App'x 43, 43-44 (3d Cir. 2019) (citing *Rau v. Wilden Acres, Inc.*, 376 Pa. 493, 103 A.2d 422, 424 (1954)). "Pennsylvania common law recognizes the 'right to flowage'—the right of an upper-landowner to have the surface waters flowing on their land to be discharged through the 'natural water course' onto the land of another." *Id.* at 44 (citations omitted). This is known as a common-enemy rule.

"However, an upper landowner is liable for the effects of surface water running off his property in two distinct circumstances: (1) where the landowner has diverted the water from its natural channel by artificial means; or (2) where the landowner has unreasonably or unnecessarily increased the quantity or changed the quality of water discharged upon his neighbor." *MD Mall*, 777 Fed. App'x at 44; *see also MD Mall*, 288 F. Supp. 3d at 584 ("The upper landowner's right of flowage is subject to two exceptions. First, the upper landowner may not alter the natural flow of surface water on his property by concentrating it [in] an artificial channel and discharging it upon the lower land of his neighbor even though no more water is thereby collected than would naturally have flowed upon the neighbor's land in a diffused condition. Second, the upper landowner may not unreasonably or

23

unnecessarily change the quality of quantity of the water discharged on the lower land.") (internal citation and quotation marks omitted).  Therefore, "[t]o impose liability on an upper landowner for the effects of surface water runoff on a lower-lying property, the lower landowner must show one of the exception applies—that the upper landowner either diverted the water from its natural channel by artificial means, or unreasonably or unnecessarily increased the quantity (or changed the quality) of water discharged upon his neighbor." *Id.* (internal citation and quotation marks omitted).

The Court finds that the Commission plausibly alleges trespass under Pennsylvania law and Count III of the FAC is not barred by the common enemy doctrine.  (Doc. 11, ¶¶ 21-23, 31, 34, 36, 41, 61-63).  More specifically, the FAC plausibly alleges that the Defendant altered the stormwater infrastructure on the Commission's own Property and unreasonably or unnecessarily increased the quantity and quality of water on the Property.  (*Id.*, ¶ 34). The Commission has alleged sufficient plausible factual content, which the Court accepts as true, to state a claim for trespass liability under Pennsylvania common law.  *See Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 126 (E.D. Pa. 2019) ("Taking all inferences in Plaintiffs' favor, Plaintiffs allege that Defendants improperly constructed the pipelines and that, in doing so, Defendants diverted a thing, water, onto Plaintiff's land. While Plaintiffs' claims would surely benefit from a fuller articulation of the facts, taking all inferences in Plaintiff's favor, they allege facts to plausibly give rise to a trespass claim."). Accordingly, Defendant's motion to dismiss Count III of the FAC will be denied.

24

## Private Nuisance

Similarly, the Court will reject Defendant's motion to dismiss the private nuisance claimed alleged in Count II of the FAC. Like the trespass claim, Defendant argue that the Commission's nuisance claim is barred by the "common enemy doctrine" and that the FAC fails to plausibly allege a claim for private nuisance "because the complaint is devoid of any allegation that the infrastructure increased water flow from what previously existed." (Doc. 20 at 19). Like the trespass claim, the Court disagrees with Defendant.

"Consistent with the Restatement (Second) of Torts, Pennsylvania law recognizes two types of nuisances: (i) public nuisance and (ii) private nuisance." *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 220 (3d Cir. 2020). "A public nuisance is 'an unreasonable interference with a right common to the general public,' such as the right to clean public water and fresh air in public spaces. *Id.* (quoting *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3d Cir. 1985)). "A private nuisance exists when a person's conduct invades another's interest in the private use and enjoyment of land, and that invasion is either intentional or unreasonable or unintentional but negligent."[5] *Id.* at 222-23.

---

[5]    "Although public and private nuisance are distinct causes of action, they are not mutually exclusive." *Baptiste*, 965 F.3d at 223. The "critical difference between these two theories of liability is not the number of persons harmed but the nature of the right affected: a public nuisance requires interference with common or *public* rights, while a private nuisance requires only interference with personal or *private* rights." *Id.* (emphasis in original).

The Court finds that Plaintiff has plausibly alleged a claim for private nuisance and that Count II of the FAC is not barred by the common enemy doctrine. Although Defendant claims that the FAC is "devoid of any allegation that the infrastructure increased water flow from what previously existed," (Doc. 20 at 19), the Court disagrees. Giving the Commission the benefit of every reasonable inference, the FAC plausibly alleges that Defendant increased water flow from what previously existed on the Property and altered the quality or quantity of the stormwater discharged on the Commission's Property. The FAC alleges "significant erosion of the land surface; the creation of gullies and channels through the vegetated area on the Property that never existed before; potential for substantial continual flooding of the Property; *the creation of ponded water in areas that never before existed on the Property; the expansion of ponded water on the property*; and the carrying of trash, debris, sediment, and other pollution onto the Property." (Doc. 11, ¶ 34) (emphasis added). The factual allegations in the FAC are sufficient to preclude dismissal of Count II of the FAC at this stage of the proceedings.

### C.    The Commission Plausibly Alleges a Violation of the Clear Streams Law.

Defendant moves to dismiss the Commission's state statutory claim under the CSL alleged in Count IV of the FAC. (Doc. 29 at 19-23). According to Defendant, "Plaintiff's claim fails to the extent it seeks damages, as the statute provides only for prospective injunctive relief and does not authorize private parties to seek damages." (*Id.* at 19). Defendant further notes that the FAC "lacks any allegation of unlawful discharge of

pollutants or violation of permit conditions" and "does not even allege that the water in question constitutes a 'pollutant' as defined by the statute." (*Id.* at 21). The Commission claims that it is not seeking damages, but an order declaring that Defendant violated and continues to violate the CSL, injunctive relief enjoining the Defendant from maintaining the altered stormwater infrastructure and continuing the stormwater discharge on the Property, an order directing Defendant to remove the altered stormwater infrastructure, and attorneys' fees and costs. (Doc. 23 at 18-19).

The Commission brings its claims pursuant to 35 P.S. § 691.601. The statute provides that "[a]ny activity or condition declared by this act to be a nuisance or which is otherwise in violation of this act, shall be abatable in the manner provided by law or equity for the abatement to public nuisances." 35 P.S. § 691.601(a). The statute goes on to provide:

> (c) Except as provided in subsection (e), any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act against the department where there is alleged a failure of the department to perform any act which is not discretionary with the department or against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act. Any other provision of law to the contrary notwithstanding, the courts of common pleas shall have jurisdiction of such actions, and venue in such actions shall be as set forth in the Rules of Civil Procedure concerning actions in assumpsit.
>
> (e) No action pursuant to this section may be commenced prior to sixty days after the plaintiff has given notice in writing of the violation to the department and to any alleged violator, nor may such action be commenced if the department has commenced and is diligently prosecuting a civil action in a court of the United States or a state to require compliance with this act or any rule, regulation, order

27

or permit issued pursuant to this act, but in any such action in a court of the United States or of the Commonwealth any person may intervene as a matter of right.

(g)The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accord with the Rules of Civil Procedure.

35 P.S. § 691.601(a), (c), (e), (g).

Although the statute does not provide for a civil cause of action to recover damages for alleged violations of the CSL, the Commission does not seek damages for a violation of the CSL. Rather, the Commission brings its claims pursuant to 35 P.S. § 691.601(c) and seeks declaratory and injunctive relief, as well as attorneys' fees, all of which are expressly permitted by the CSL. Accordingly, the Court will deny Defendant's motion to dismiss Count IV because the Commission is not seeking monetary damages under the CSL, but instead it seeks equitable and other relief permitted by the CSL.[6]

## D.    The Court Will Not Dismiss the Request for Punitive Damages

Finally, Defendant seeks dismissal of the Commission's request for punitive damages on its negligence claim alleged in Count I. (Doc. 20 at 15-16). Under Pennsylvania law, punitive damages are appropriate on a negligence claim where the

---

[6]    To the extent that Defendant claims that the Commission fails to plausibly allege a claim under the CSL, that motion will be denied. Defendant further notes that the FAC "lacks any allegation of unlawful discharge of pollutants or violation of permit conditions" and "does not even allege that the water in question constitutes a 'pollutant as defined by the statute." (Doc. 20 at 21). But the FAC clearly alleges that Defendant violated, and continues to violate, its NPDES permit conditions. (Doc. 11, ¶¶ 18-33).

defendant's actions "are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct." *SHV Coal, Inc. v. Cont'l Grain Co.*, 526 Pa. 489, 493, 587 A.2d 702 (1991). Reckless indifference may also support an award of punitive damages. A defendant acts with reckless indifferent when he "knows, or has reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." *Id.* at 494. Because the FAC alleges intentional and reckless conduct on the part of Defendant, (Doc. 11, ¶¶ 22-23, 31, 37-39, 50-51), the Court will not dismiss the Commission's request for punitive damages at the motion to dismiss to stage.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge